USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/3/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
:
BLAKE LIVELY,                                                      :
:
                           Movant,                                 :
:                    25-mc-347 (LJL)
          -v-                                                      :
:                    MEMORANDUM AND
THE SKYLINE AGENCY LLC and ROZA                                    :          ORDER
KALANTARI,                                                         :
:
                           Respondents.                            :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

   Plaintiff-Movant Blake Lively ("Lively") moves, pursuant to Federal Rules of Civil Procedure 45(d)(2)(i) and 45(e)(2), to compel the production of a Signal message chat (the "Signal Chat") allegedly improperly withheld from production by Respondents The Skyline Agency LLC ("Skyline") and Roza Kalantari ("Kalantari," and together with Skyline, "Respondents" or the "Skyline Parties"). Lively subpoenaed the Signal Chat in connection with *Lively v. Wayfarer Studios LLC*, No. 24-cv-10049 (S.D.N.Y. filed Dec. 31, 2024), pending in this Court (the "Lively Action"). Dkt. No. 1.

                                            **BACKGROUND**

   Lively filed this motion to compel on August 6, 2025, in the United States District Court for the Northern District of Texas. *Id.*; Dkt. No. 2. At the same time, she filed a motion to transfer the proceedings to this Court. Dkt. No. 4–5. On August 13, 2025, on consent, the United States District Court for the Northern District of Texas granted Lively's motion to transfer. Dkt. No. 19. Respondents filed a letter in opposition to the motion to compel in this Court on August 22, 2025. Dkt. No. 26. On August 25, 2025, Lively filed a letter reply in

further support of her motion, along with the declaration of counsel attaching Respondents' objections to the notice of subpoena and email correspondence between counsel.  Dkt. Nos. 27–28.  On August 26, 2025, this Court ordered Respondents to submit the Signal Chat for *in camera* review.  Dkt. No. 29.  Respondents have done so, and the Court has reviewed the relevant messages.  The Court now grants the motion to compel and directs that the Signal Chat be produced no later than September 5, 2025.

The Court presumes familiarity with the proceedings in the Lively Action and a related case, *Wayfarer Studios LLC v. Lively*, 25-cv-449 (S.D.N.Y. filed Jan. 16, 2025) (the "Wayfarer Action").  It describes only those allegations necessary to understand its decision.  Lively is an actor.  Lively Action Dkt. No. 520 ¶ 56.  She is married to the actor Ryan Reynolds ("Reynolds").  *Id.* ¶ 19.  She co-starred in the film "It Ends With Us" with Justin Baldoni ("Baldoni").  *Id.* ¶ 2.  The movie was produced by Wayfarer Studios, LLC ("Wayfarer"), along with Sony Pictures Entertainment.  *Id.* ¶¶ 2, 11.  Jamey Heath ("Heath") is the Chief Executive Officer of Wayfarer.  *Id.* ¶ 11.  Steve Sarowitz ("Sarowitz") is a co-founder and financier of Wayfarer.  *Id.* ¶ 26.  The Agency Group PR LLC ("TAG") is a media relations firm.  *Id.* ¶ 29.  Melissa Nathan ("Nathan") is a consultant who provides crisis management and communications services, and Jennifer Abel ("Abel") provides public relations services.  *Id.*  Jed Wallace ("Wallace") is a public relations consultant who offers crisis-mitigation services.  *Id.* ¶ 38.

On December 31, 2024, Lively filed a complaint in this Court against Wayfarer, Baldoni, Heath, Sarowitz, Nathan, TAG, Abel, and It Ends With Us Movie LLC ("IEWU").  Lively Action Dkt. No. 1.  Lively alleged claims of sexual harassment, retaliation, breach of contract, and intentional and negligent infliction of emotional distress stemming from the treatment that she allegedly received from Wayfarer, Baldoni, and Heath during the filming of "It Ends With

Us," and from an alleged smear campaign launched by the defendants after filming in retaliation for her claims of sexual harassment. *Id.* On February 18, 2025, Lively filed an amended complaint adding Wallace as a defendant. Lively Action Dkt. No. 84. She filed a second amended complaint on July 30, 2025. Lively Action Dkt. 520.

On January 16, 2025, Wayfarer, Baldoni, Heath, IEWU, Nathan, and Abel filed their own complaint in this Court against Lively, Reynolds, Leslie Sloan, and Vision PR, Inc. (the "Wayfarer Complaint"). Wayfarer Action Dkt. No. 1. The Wayfarer Complaint contained claims for civil extortion, defamation, false light invasion of privacy, breach of the implied covenant of good faith and fair dealing, intentional interference with contractual relations, and negligent and intentional interference with prospective economic advantage. *Id.* The complaint was accompanied by an 168-page timeline (the "Timeline"). Lively Action Dkt. No. 50-1.

The Skyline Agency LLC is a Dallas-based digital marketing and design services company, and Roza Kalantari is its chief marketing officer. Dkt. No. 2 at 3. Wayfarer, Baldoni, Heath, IEWU, Nathan, and Abel are represented by Mitra Ahouraian ("Ahouraian") and Bryan Freedman ("Freedman"), Theresa M. Troupson ("Troupson"), and Jason Sunshine ("Sunshine") of the law firm Liner Freedman Taitelman & Cooley, LLP ("Liner"). *Id.* at 4. There is no indication that Wallace or Kalantari were represented by Liner during the period at issue in this current dispute, which involves a single chain of messages conveyed through the messaging application Signal that runs from January 12, 2025, before the filing of the Wayfarer Complaint, to February 18, 2025. The messages concern the building of a publicly available website, www.thelawsuitinfo.com (the "Website"), where individuals could download the Wayfarer Complaint and Timeline. The Website launched in the immediate aftermath of the public filing of those documents. In the lead up to the filing of the Wayfarer Complaint and Timeline, the

3

participants in the chat discuss the creation of the Website and how it will be publicized, including whether it will be attributed to counsel for Wayfarer. In the aftermath of the filing of the Wayfarer Complaint and Timeline and the launch of the Website, the participants discuss the public attention that the Website has attracted.

A large number of individuals are included on the Signal Chat. They include: (1) Kalantari; (2) Abel, Nathan, and Heath; (3) Mitz Koskovic, a Wayfarer employee; (4) Freedman, Troupson, and Sunshine from Liner; (5) Wallace; and (6) Rylie Long, Dervla McNiece, Breanna Koslow, Michael Lawrence, and Alyx Sealy, employees of TAG.

## DISCUSSION

Lively argues that the Signal Chat is not protected from production under the attorney-client privilege because (1) the Skyline Parties have not satisfied their burden of showing that the communications were made for the purpose of obtaining or conveying legal advice, and (2) any privilege was waived because the communications were not held in confidence. Dkt. No. 2 at 1–2. The Skyline Parties resist production of the communications on the grounds that (1) Lively has not met her burden of showing relevance, and (2) the messages are protected by the attorney-client and common-interest privileges. Dkt. No. 26 at 2–3.[1] In their privilege log served on Lively, the Skyline Parties claim that the Signal Chat and each message within it is privileged because the messages concern the same subject, the building of the Website, which was done at the direction of counsel, and because counsel either received or sent each message in the chain. Dkt. No. 3 at 4, 11, 14. The Skyline Parties now assert that the chain is privileged because the communications "were made for the purpose of obtaining legal advice regarding the content to

---

[1] The Skyline Parties do not object on attorney work-product grounds, and any such arguments are accordingly deemed forfeited.

4

be placed on the Website." Dkt. No. 26 at 2.

As an initial matter, the Skyline Parties have effectively conceded that the materials are relevant by including them on their privilege log. The purpose of a Rule 26(b)(5)(A)(ii) privilege log is to flag for an opposing party "otherwise discoverable" materials that have been withheld due to an assertion of privilege. Fed. R. Civ. P. 26(b)(5)(A)(ii). Materials must be relevant in order to be discoverable. Fed. R. Civ. P. 26(b)(1). Thus, by indicating that the withheld materials would have been discoverable but for their assertion of privilege, the Skyline Parties have acknowledged the materials' relevance. *See Oxygenator Water Techs., Inc. v. Tennant Co.*, 2023 WL 11959150, at *4 (D. Minn. July 25, 2023) ("[W]hen a party produces a privilege log, information on that log is presumed to be 'otherwise discoverable,' i.e., relevant." (quoting *Williams v. Corelogic Rental Prop. Sols*, 2016 WL 6277675, at *3 (D. Md. Oct. 26, 2016))). Moreover, the Skyline Parties' acknowledgment of relevance was an appropriate one given the nature of Lively's allegations. *See* Lively Action Dkt. No. 520 ¶¶ 296–312. The Court therefore turns to the Skyline Parties' assertion of privilege.

Because Lively's complaint asserts both federal and state claims and the requested information is relevant to both sets of claims, principles of federal law apply. *See von Bulow ex rel. Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987). Under federal law, "[a] party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007); *accord United States v. Constr. Prods. Rsch., Inc.*, 73 F.3d 464, 473 (2d Cir. 1996). "The purpose of the privilege is to encourage clients to make full disclosure to their attorneys." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999) (internal quotation marks and citation

omitted); *accord Stryker Corp. v. Intermedics Orthopedics, Inc.*, 145 F.R.D. 298, 301 (E.D.N.Y. 1992). Courts have emphasized that "[w]hile the privilege confers important social benefits, it also exacts significant costs" because "[i]t runs counter to the ordinary judicial interest in the disclosure of all relevant evidence." *In re Application of Sarrio, S.A.*, 119 F.3d 143, 147 (2d Cir. 1997) (citation omitted); *accord In re Bairnco Corp. Secs. Litig.*, 148 F.R.D. 91, 96 (S.D.N.Y. 1993) (noting that "the attorney-client privilege both advances and impedes the administration of justice"). Accordingly, courts apply the attorney-client privilege "only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (internal quotation marks and citation omitted). "A document is not privileged merely because it was sent or received between an attorney and client. The document must contain confidential communication relating to legal advice." *Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.)*, 139 F.R.D. 295, 300 (S.D.N.Y. 1991).

"[T]he burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *von Bulow*, 811 F.2d at 144 (quoting *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224 (2d Cir. 1984)). "A showing that the privilege is applicable and has not been waived 'must be based on competent evidence, usually through affidavits, deposition testimony, or other admissible evidence.'" *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, N.Y.*, 171 F. Supp. 3d 136, 143 (S.D.N.Y. 2016) (quoting *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 428 (S.D.N.Y. 2013)). The party invoking the privilege also has the burden of demonstrating that the privilege has not been waived. *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 391 (S.D.N.Y. 2015).

The Skyline Parties have not satisfied their burden of establishing that the Signal Chat is

privileged and, even if they had, the privilege has been waived. There is *de minimis*, if any, privileged content in the Signal Chat. The bulk of the chat involves communications from Heath to members of the public relations team including Kalantari, Wallace, and Nathan regarding the launch of the Website. Heath and members of the public relations team discuss the content to be posted, the means by which the public will be informed of the Website, and the attention that the Website has attracted. Although attorneys are copied on the chat, their presence is incidental, as the same communications would have taken place without them.

There are only a handful of text messages which even arguably call for a response from the lawyers. Early in the message chain, Kalantari asks whether it is "possible to have legal review what's upon the staging link" for the Website. Kalantari also states at another point early in the chain that it "would be great if Legal or whoever is authorized to review look over every single one of these images to ensure it has approval and do the redacting." Heath states at another point, "For the website, I have many legal questions and need to have full clarity as to any legal exposure." Sunshine, one of the lawyers from Liner, states that the Wayfarer Complaint and Timeline will be "cloaked in the litigation privilege," and Freedman states: "If it comes from me, the rest of you are insulated." Finally, at the end of the chain of messages, Kalantari informs the group that she received "an email saying the website was subpoenaed" and asks whether it is "possible to transfer it to you guys so it doesn't come back to my company?" After advising Kalantari not to transfer anything, Sunshine states: "She's not a client and it's not privileged."

In context, it is dubious that any of the messages is privileged. Kalantari's early messages do not ask for legal advice regarding her potential liability or any other legal issue for that matter. Kalantari instead asks that "Legal or whoever is authorized to review" look over the

7

Website's contents because the lawyers created that content (the Website included only the Wayfarer Complaint and Timeline), and they were therefore able to confirm whether the documents on the Website were identical to those that would be filed on the public docket. Indeed, the attorneys provided no legal advice to Kalantari. And a lawyer's transmission of a document to a public relations firm for public distribution does not make the transmission privileged. *See Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003); *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).

As to Heath's message regarding legal exposure, it is notable that the message is not directed to counsel and does not pose any questions for counsel to answer. His message is best understood as an instruction from a client (Wayfarer) to its agents (Kalantari, Wallace, and Nathan) that they should not launch the Website until after counsel has issued approval. Counsel was not necessary to that communication, and the communication neither requested nor conveyed legal advice.

Although Kalantari's message regarding the subpoena can fairly be understood as a request for legal advice, Sunshine's response makes clear that Kalantari was not Liner's client. Because the message was made neither in the course of legal representation nor in anticipation of representation, it was not privileged. *See Cuomo v. Off. of N.Y. State Att'y Gen.*, 754 F. Supp. 3d 334, 358 (E.D.N.Y. 2024) ("Critical to the attorney-client privilege is the relationship between client and counsel."); *United States v. Falzone*, 766 F. Supp. 1265, 1270 (W.D.N.Y. 1991) ("Obviously, the attorney-client privilege hinges upon the existence of an attorney-client relationship.").

The only messages that might contain privileged content are those from Sunshine stating that the Website will be "cloaked in litigation privilege" and from Freedman stating that because

8

the messages come from him, the other participants in the message chain will be "insulated" from legal liability. These communications are responsive to Heath's comment regarding the need for legal clarity regarding his "exposure." The Court thus assumes that Sunshine and Freedman were intending to provide legal advice to their client, Heath. However, even if the messages would have been privileged if contained in a private communication from Sunshine and Freedman to Heath, any privilege was waived because the messages were shared with nonclients, including Kalantari and Wallace.

"Normally, as the Second Circuit has held, 'disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed.'" *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 86 (S.D.N.Y. 2019) (quoting *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973)). The Second Circuit has identified only limited circumstances in which disclosure to a third party does not result in a waiver of the attorney-client privilege. *Id.* at 87. One of those circumstances is where an attorney or client includes their agent in a communication and the agent's presence is necessary to assist the attorney in providing legal services. *See Ayrton Cap. LLC v. Bitdeer Techs. Grp.*, 2025 WL 743761, at *2 (S.D.N.Y. Mar. 7, 2025). A document may also be shared with a person who is nominally a third party but in reality is a functional equivalent to an employee without resulting in waiver of the privilege. *See SEC v. Rayat*, 2023 WL 4706074, at *3 (S.D.N.Y. July 24, 2023).

These exceptions to the waiver rule do not apply here. The Skyline Parties do not contend that Kalantari was the functional equivalent of an employee of Wayfarer. It appears that Skyline and Kalantari were hired for the limited purpose of creating and possibly disseminating the Website. Furthermore, the Skyline Parties do not contend that their inclusion in the Signal

9

Chat was necessary for Liner to provide legal advice or assistance. A lawyer or client may share a privileged communication with a media or public relations expert without waiving the privilege if the attorneys are "using the public relations consultant 'to implement a specific legal strategy that require[s] the use of a public relations consultant.'" *Universal Standard*, 331 F.R.D. at 92 (citation omitted). For example, in *In re Grand Jury Subpoenas Dated Mar. 24, 2003*, 265 F. Supp. 2d 321, 329 (S.D.N.Y. 2003), the court considered whether the inclusion by an attorney of a public relations firm in otherwise privileged communications resulted in a waiver of the privilege. The attorney was retained to represent the target of a grand jury investigation, and the public relations firm was hired to conduct a media campaign to paint the target in a favorable light so that the prosecutors might be less likely to indict. *Id.* at 323–24. The court held that counsel could share his privileged communications with the public relations firm because the communications were "made for the purpose of giving or receiving advice . . . [and were] directed at handling the client's legal problems." *Id.* at 331–32.

"That is a far cry from the situation here." *Universal Standard*, 331 F.R.D. at 92. "A media campaign is not a litigation strategy. Some attorneys may feel it is desirable at times to conduct a media campaign, but that decision does not transform their coordination of a campaign into legal advice." *Haugh*, 2003 WL 21998674, at *3. "It may be that the modern client comes to court as prepared to massage the media as to persuade the judge," but that does not make the client's communications "for the former purpose . . . the obtaining of legal advice or justif[y] a privileged status." *Calvin Klein*, 198 F.R.D. at 55. "On any fair view of the materials submitted for the Court's *in camera* inspection, [the Skyline Parties] d[o] not appear to have been performing functions materially different from those that [they] would have performed if they had been hired directly by" Wayfarer. *Id.* at 55. Reviewing the Signal Chat makes clear that the

10

public relations experts involved were not retained to implement any specific legal strategy. The Skyline Parties do not contend that their public relations efforts were directed at the Court. And they could not properly have directed any public relations efforts at a potential jury pool. *See* N.Y. Rules of Professional Conduct 3.6. As one court has explained, "protecting [a client's] public image and reputation" is "decidedly different from the use of the public relations firm in *In re Grand Jury Subpoenas*." *See McNamee v. Clemens*, 2013 WL 6572899, at *6 (E.D.N.Y. Sept. 18, 2013). These exceptions to the waiver rule therefore do not apply.

The Skyline Parties invoke an additional exception to the waiver rule known as the common-interest privilege, which "applies when clients with separate attorneys and similar legal interests share information with one another." *Rayat*, 2023 WL 4706074, at *3. "The common-interest privilege comes into play when those clients 'share otherwise privileged information in order to coordinate their legal activities.'" *Id.* (quoting *In re Teleglobe Comm'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007)); *see also* Restatement (Third) of The Law Governing Lawyers § 76 cmt. b (A.L.I. 2024) (explaining that the rule is intended to allow "persons who have common interests to coordinate their positions without destroying the privileged status of their communications with their lawyers").

This exception is also of no assistance to the Skyline Parties. The Skyline Parties assert that "[a]ll parties to the communication, including Skyline and Jed Wallace, had an identical, common interest in legal issues surrounding the posting of information to the Website." Dkt. No. 26 at 3. That assertion is insufficient to shield the messages with the privilege, for "[w]here the communication was not originally made between client and counsel for the purpose of obtaining legal advice, it is not privileged in the first place." *Smith v. Pergola 36 LLC*, 2022 WL 17832506, at *8 (S.D.N.Y. Dec. 21, 2022); *see Sokol v. Wyeth, Inc.*, 2008 WL 3166662, at *5

11

(S.D.N.Y. Aug. 4, 2008) ("If a communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply."); *see also United States v. Krug*, 868 F.3d 82, 87 (2d Cir. 2017). The mere inclusion of counsel in a communication does not make it privileged. *See Arthur Anderson*, 139 F.R.D. at 300; *see also Asuncion v. Metro. Life Ins. Co.*, 493 F. Supp. 2d 716, 720 (S.D.N.Y. 2007).

Moreover, the assertion is missing one of the fundamental elements of the common-interest privilege—coordination between clients with separate attorneys. "Courts in this circuit have acknowledged that . . . the common interest doctrine applies only where a party has demonstrated the existence of an agreement to pursue a common legal strategy." *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 72 n.12 (S.D.N.Y. 2009) (Lynch, J.); *see also Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995) (noting that in order for the doctrine to apply, parties "must have demonstrated cooperation in formulating a common legal strategy"); *Rayat*, 2023 WL 4706074, at *3 (holding that the privilege "applies when clients with separate attorneys and similar legal interests . . . share otherwise privileged information in order to coordinate their legal activities"); *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) ("The common-interest rule serves to 'protect the confidentiality of communications . . . where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.'" (citation omitted)); *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989) ("The common interest rule clearly is applicable here, since the information given . . . was imparted in confidence for the ultimate purpose of assisting attorneys who had agreed upon and undertaken a joint strategy of representation . . . .").

The Skyline Parties have offered neither evidence nor allegations regarding the attempted

coordination of legal activities between individuals with different lawyers. What they have instead suggested is that simply engaging in an activity with others who share the same general goal of avoiding legal liability is sufficient to "exten[d] the attorney client privilege" to all communications involving that enterprise, even to communications with third parties who are unrepresented or who have different representation. *See Schwimmer*, 892 F.2d at 244. The common-interest privilege does not stand for so broad a principle. *See Bank Brussels*, 160 F.R.D. at 448 (holding that "the presence of [a shared] concern about litigation does not bring a disclosure within the common interest doctrine" unless there is also "some evidence of a coordinated legal strategy"). Indeed, if it did, ordinary communications with public relations firms might routinely qualify as privileged. *But see Universal Standard*, 331 F.R.D. at 87 (noting that "many cases have rejected . . . protection for materials relating to public relations activities" and declining to extend any privilege to communications with a public relations firm); *Haugh*, 2003 WL 21998674, at *3 (same); *Calvin Klein*, 198 F.R.D. at 55 (same).

What's more, extending the attorney-client privilege in this way would not only bestow certain benefits on third parties, but certain corresponding obligations on attorneys. The Skyline Parties do not contend, nor could they, that their and Wallace's inclusion in the communications conferred on each of them the right to prevent Liner from disclosing the content of the communications. But that is the upshot of their claim that the common-interest doctrine applies. Because the common-interest doctrine "is not an independent source of privilege or confidentiality," *see Sokol*, 2008 WL 3166662, at *5, the Skyline Parties are effectively invoking the attorney-client privilege. And the attorney-client privilege confers a right on all clients to prevent dissemination of the communication to third parties and imposes the correlative obligation on counsel to keep the communication confidential. *See Falzone*, 766 F. Supp. at

13

1269 (noting that the "attorney-client privilege and the attorney's duty of confidentiality of client communications are crucial aspects of our legal system," and that this duty "continues even after termination of the attorney-client relationship"); ABA Model Rules of Professional Conduct 1.6. This fact, too, counsels in favor of narrower view of the doctrine—especially given that applying the doctrine more broadly might prevent attorneys from disclosing communications that would benefit their actual clients due to obligations to third parties.

At bottom, the Skyline Parties and Wallace, like Wayfarer, may have had an overlapping interest in avoiding legal liability. That is presumably an interest that all people in a joint endeavor might share. But Liner was not their counsel—nor had they agreed to engage in a shared legal representation or strategy with Liner at the direction of their own attorneys. The Wayfarer Parties' inclusion of these parties in their communications with counsel therefore waived any privilege that might have otherwise existed. *See Universal Standard*, 331 F.R.D. at 86; *In re Horowitz*, 482 F.2d at 81; *see also Spencer-Smith v. Ehrlich*, 2024 WL 4416581, at *10–11 (S.D.N.Y. Oct. 4, 2024); *Caruso v. Grace*, 2012 WL 2497274, at *8 (S.D.N.Y. June 27, 2012).

## CONCLUSION

The motion to compel is GRANTED. The Skyline Parties shall produce the Signal Chat no later than September 5, 2025.

SO ORDERED.

Dated: September 3, 2025
New York, New York

_____
LEWIS J. LIMAN
United States District Judge

14